UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60101-CR-SMITH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CINDY VANDIVIER,

    Defendant.

_____/

## MEMORANDUM REGARDING RESTITUTION

Cindy Vandivier, through counsel, respectfully files this Memorandum Regarding Restitution and states as follows.

On January 27, 2023, the Court sentenced Cindy Vandivier to 24 months incarceration. (DE 412). Ms. Vandivier surrendered to begin serving that sentence on March 28, 2023. The Court has scheduled a restitution hearing for July 13, 2023. Ms. Vandivier now files this memorandum regarding the proper amount of restitution to be imposed in this matter.

Prior to the sentencing hearing, counsel for Ms. Vandivier filed objections to the PSI contending that the PSI's loss calculation was in error. (DE 312). The government filed a Response (DE 343) and counsel filed a Reply in Opposition to the Government's Response. (DE 361).

1

Ms. Vandivier maintained that the PSI loss computation failed to apply a "net loss" calculation and failed to reduce the actual loss to victims based on the present value of stock purchased by victims (which Ms. Vandivier related would be established by competent evidence at the time of sentencing). The PSI at paragraph 48 concluded that there was a loss amount of $2,111,384. After hearing the testimony of Defense witnesses Harry McMillan and Jorge Baez the Court accepted the loss calculation offered by the defense and reduced the loss to between $550,000 and $1,500,000. Mr. Baez gave his opinion that the actual loss suffered by Vandivier investors was between $420,000 to 650,000 (See sentencing transcript attached hereto as Defense Exhibit A at page 51). As discussed below, the Eleventh Circuit has held that the actual loss amount will be the amount of restitution. Ms. Vandivier requests that the Court order restitution according to the actual loss amount determined at the sentencing hearing, as indicated above.

### Summary of the Argument Regarding the Correct Loss

Ms. Vandivier noted in her objections that the PSI calculation of a loss of $2,111,384 was based on a finding of ***intended loss*** which she related was clearly wrong based on the guideline definition of intended loss and the case law applicable thereof. (DE 312:3-8). She stated the following.

The sentencing guidelines define intended loss as the "pecuniary harm that the defendant ***purposely sought to inflict,***" U.S.S.G. § 2B1.1 comment. (n. 3(A)(ii)(emphasis added), and the defendant's ***subjective intent is relevant*** to the

2

intended loss inquiry. The facts of the case are clear. Investors were solicited to purchase stock in a real company, developing a real "App", with a real patent pending that the parties believed would produce significant returns for investors. Ms. Vandivier thought and intended that, once the "App" became fully operational, all investors would reap a healthy profit from their purchase. Importantly, "intended loss refers to the defendant's subjective expectation, not the risk of loss to which he may have exposed his victims," *United States v. Yeaman,* 194 F.3d 442, 457 (3rd Cir. 1999). Further, the case law confirms subjective intent as the touchtone of intended loss as distinct from a regime in which the defendant is presumed to intend the natural and probable consequences of his acts. *United States v. Confredo,* 528 F.3d 143, 152 (2nd Cir. 2008)(DE 312:As demonstrated below, there was no intended loss. (DE 312:3).

Pursuant to U.S.S.G. §2B1.1 n. 3(A)(i), the correct determination of loss is calculated by computing the ***actual loss*** to victims. In calculating the actual loss, the guidelines apply a metric that utilizes a "net-loss" approach to victims which accounts for not only what the victims lost as a result of the fraud but also what the victims gained. Effective November 1, 2001, the United States Sentencing Commission approved a group of amendments to guidelines governing the sentencing of economic crimes. This "economic crime package" set forth a sentencing regime that calculates loss as a measurement of ***net*** economic deprivation to victims. *United States v. Hausmann,* 345 F.3d 952, 960 (7th Cir. 2003)(finding 2001 economic crime guideline

3

adopts "credit against loss" approach. Sentencing guidelines call for the court to determine the net detriment to the victim, rather than the gross amount of money that changes hands); *United States v. Ruzicka,* 988 F.3d 997, 1012 (8th Cir. 2021)(the guidelines employ a net-loss approach that accounts for not only what the victim lost as a result of the fraud but also what the victim gained).*United States v. Reda,* 787 F.3d 625, 631-32 (1st Cir. 2015)(defendant must be credited for the value of stock government acquired during sting operation, "[I]f the shares received carry any market value, the district court should have reduced its loss calculation by that amount citing *United States v. Prange,* 771 F.3d 17, 35-37 (1st Cir. 2014)(On remand, common stock, which had some value, must be considered by the district court).(DE 312:4).

Ms. Vandivier then demonstrated that the stock in the Stocket company that investors purchased from Bhagavad Management had significant present value. Indeed, a receiver appointed in a civil case brought by investors recently sold the assets of Stocket to TCI acquisition for $10,932,000 and TCI was in the midst of an Initial Public Offering ("IPO") for potentially (and substantially) much more. As a result, investors that purchased stock in Stocket from Bhagavad Management have stock that has significant present value. Applying the guidelines "net-loss" calculation, the present value of the stock to investors must be deducted from their initial investment to properly compute the actual loss in this case. Ms. Vandivier stated that at sentencing hearing, the defense would produce witnesses and evidence

to establish the updated status of the IPO and the current value of the shares of stock to the stockholders/victims in this case in order to allow the Court to determine the gain to investors for the net-loss computation.(DE 312:5).

### The Government Agreed that Actual Loss was the Correct Computation Method

In Government's Memorandum in Support of Sentencing and Response to Paul and Cindy Vandivier's Objections to the Presentence Investigation Report (DE 343), the government abandoned the "intended loss" argument forwarded in the PSI (at paragraph 48) and conceded that the actual loss computation was the appropriate measurement of loss. "Under the Guidelines, the Vandiviers must be held responsible for all 'Reasonably Forseeable Pecuniary Harm' *See* Section 2B1.1, application note 3(A)(i)("Actual Loss")." (Government's Memorandum, DE 343:8).

### The Clear Language of the Guidelines Precluded an "Intended Loss" Calculation

In her Objections Ms. Vandivier demonstrated that the PSI was wrong in finding that the Ms. Vandivier should be held responsible for an ***intended loss*** of $2,111,384. (Paragraph 48 of the PSI). She noted,

> Intended loss is defined as "pecuniary harm that the defendant ***purposely sought to inflict***." U.S.S.G. § 2B1.1 comment. (n. 3(A)(ii)(emphasis added). The defendant's ***subjective intent is relevant*** to the intended loss inquiry. U.S.S.G. App. C, amend. 792 (effective Nov. 1, 2015)(emphasis added). Moreover, intended loss includes "pecuniary harm that would have been ***impossible or unlikely*** to occur."

5

>U.S.S.G. § 2B1.1 comment n. 3(A)(ii)(emphasis added).

She argued that the evidence in the case was clear that investors were solicited to purchase stock in a real company, developing a real "App", with a real patent pending that the parties believed would produce significant returns for investors. Ms. Vandivier thought and intended that, once the "App" became fully operational, all investors would reap a healthy profit from their purchase. The idea that Ms. Vandivier intended a loss for investors is patently and demonstrably false and should be rejected by this Court. Indeed, while it is true that Ms. Vandivier made material misrepresentations to investors, she intended a pecuniary gain for them, not a loss. (DE 312:6-8).

**The applicable case law demonstrated there was no intended loss.**

In her objections, Ms. Vandivier demonstrated that the case law was clear that in order for a loss to count as intended loss, the defendant must have subjectively desired to cause a loss or have a subjective expectation that a loss would result from his conduct and the fraud guideline, "has never endorsed sentencing based on the worst-case scenario potential loss." Thereafter, Ms. Vandivier presented a litany of case law in support of no intended loss. See DE 312:6-8 incorporated by reference herein.

6

### The PSI Loss Computation Did Not Utilize a "Net Loss" Calculation Applying a Reduction for the Present Value of Stock Previously Purchased by Victims and Thus it was Erroneous

Ms. Vandivier then noted that the government had the burden of proving the actual loss attributable to her conduct. *United States v. Stein,* 964 F.3d 1313, 1319 (11th Cir. 2020).

Further, she stated that Effective November 1, 2001, the United States Sentencing Commission approved a group of amendments to guidelines governing the sentencing of economic crimes. This "economic crime package" sets forth a sentencing regime that calculates loss as a measurement of ***net*** economic deprivation to victims. *United States v. Reda,* 787 F.3d 625, 631-32 (1st Cir. 2015)(defendant must be credited for the value of stock government acquired during sting operation, "[I]f the shares received carry any market value, the district court should have reduced its loss calculation by that amount citing *United States v. Prange,* 771 F.3d 17, 35-37 (1st Cir. 2014)(On remand, common stock, which had some value, must be considered by the district court. "A thief who steals $100,000 is more culpable than a salesman who obtains $100,000 by selling a victim an $80,000 house he fraudulently represents as being worth $100,000," and in this example $100,000 is not the accurate measure of the victim's loss and finding that a distinction must be made between the two types of fraud.); *United States v. Zolp,* 479 F.3d 715, 720-22 (2007)(reversed and remanded where district court erred in finding stock worthless and had no value where stock sold in real and not sham companies and had present value); *United States v.*

7

*Hausmann,* 345 F.3d 952, 960 (7th Cir. 2003)(finding 2001 economic crime guideline adopts "credit against loss" approach. Sentencing guidelines call for the court to determine the net detriment to the victim, rather than the gross amount of money that changes hands); *United States v. Ruzicka,* 988 F.3d 997, 1012 (8th Cir. 2021)(the guidelines employ a net-loss approach that accounts for not only what the victim lost as a result of the fraud but also what the victim gained citing, *United States v. Markert,* 732 F.3d 920, 932 (8th Cir. 2013)("[U]nder the revised guideline, actual loss is now defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G.§2B1.1 comment (n.3(A)(i)). "Actual loss" under the revised guideline is a 'net loss' concept based upon the "difference between what the victim paid and what the victim recovered plus any other forms of reasonably foreseeable harm that resulted from the offense"); *United States v. Walker,* 818 F.3d 416, 422-23 (8th Cir. 2016)("Walker is correct that the revised §2B1.1 adopted a net loss approach, which recognizes that the offender who ***transfers something of value*** to the victim generally is committing a less serious offense than an offender who does not.")(emphasis added). *United States v. Yeaman,* 194 F.3d 442, 457 (3rd Cir. 199)("Where the defendant takes something without giving anything to the victim in return, the value of the thing taken reflects the victim's loss. However, where the defendant gave something of value in exchange for what was fraudulently taken, **the victim's loss is the difference between the value of what he or she gave up and the value received in exchange**")(emphasis added). Furthermore, the

8

Eleventh Circuit is in accord. *See United States v. Slaton,* 801 F.3d 1308, 1320 (11th Cir. 2015)(case remanded for district court to recalculate the loss amount using the guidelines' net loss approach).

Moreover, similar to the instant matter, in *United States v. Geringer,* 672 Fed.Appx. 651, 652-53 (9th Cir. 2016)(unpub.), a case involving loss calculation in an investment fund, the Ninth Circuit reversed the district court's loss calculation finding that a, "[A] victim's loss should be offset by the victim's benefit for the purpose of calculating loss under the Sentencing Guidelines…[U]under this principle, the district court was obligated to determine the actual value, if any, of the fund and to deduct the actual value of the securities from the amount of the loss," citing *United States v. Lenoard,* 529 F.3d 83, 93 (2nd Cir. 2008). In *Leonard,* the district court computed the loss amount as equal to the entire cost of the securities sold by the defendants on the ground that the investors would not have invested had they realized the true size of the sales commissions (45 %), the defendants were receiving. However, the Court in *Leonard* found that this did not mean that the securities the victims received in exchange for their contributions were entirely without value. The Court found that the investors obtained an interest in a company engaged in producing and distributing a motion picture. Accordingly, the district court erred in not deducting from the purchase price the actual value of the instruments. *Id.* at 93. Moreover, in *United States v. Olis,* 429 F.3d 540 (5th Cir. 2005), the Court recognized that the 2001 guidelines, "measure criminal culpability in theft and fraud cases

9

according to their pecuniary impact on victims." *Id.* at 545. The Court in *Olis* distinguished the difference in securities cases between those ***where worthless stock*** is promoted and those where the fraud ***does not render the stock worthless*** and reiterated the principle that each case takes seriously the requirement to correlate the defendant's sentence with the actual loss caused in the marketplace, (exclusive of other sources of stock price decline). The case was remanded to the district court for resentencing. *Id.* at 546-47, 549. (emphasis added).(DE 312:8-11).

Importantly, "[W]hen calculating loss to victims according to the sentencing guidelines, the district court need only make a reasonable estimate of the loss." *United States v. Masferrer,* 514 F.3d 1158 (11th Cir. 2008) citing *United States v. Snyder,* 291 F.3d 1291, 1295 (11th Cir. 2002). Indeed the guidelines clearly state:

> **Estimation of loss.**—The Court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the Court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. §3742(e) and (f).

Ms. Vandivier noted that her case presented the unique circumstances where stock was purchased in a start-up company that was not yet fully operational. Investors were solicited to purchase stock in the Stocket Corporation which was a company ***developing*** an "App" that combined gaming with shopping. The value to investors would be ***prospective*** and would occur once the "App" was fully developed and available for actual use. The investors purchased shares for nominal amounts of

10

between $1.00 to $1.50 a share. The real "value" to investors would be once the "App" was fully developed and put into use; in this scenario the return on the investment would be potentially very lucrative. Indeed, during the time period alleged in the indictment relating to Ms. Vandivier (2017-2018), Stocket was actively engaged in developing the mobile gaming application.

More specifically, the product Stocket was developing was an internet e-commerce platform that combined mobile internet gaming with mobile internet shopping. Users of the platform would build their own retail store and play the role of a store owner. The user would select items from various retail outlets and "stock" their virtual store with a host of different products such as toys, electronics, home furnishings, airline tickets, gift cards, etc. The users would combine virtual game playing with actual retail shopping as the game player would have the option to purchase the product they were interacting with during game play. This "game commerce" platform would allow each user to be a real product re-seller in a virtual game environment thus earning commissions as they go.

Moreover, Stocket employed a team of computer programmers that were actively developing the platform. Indeed, a patent was applied for on January 4, 2016 and was pending during the time sales associates were utilized to solicit investors on behalf of Stocket. The patent was later pursued by a receiver (appointed by the Palm Beach Circuit Court in a civil suit brought by investors to recover assets) and was granted by the United States Patent Office on April 23, 2019. The patent approval

11

describes the product as, "electronic gaming platforms allowing users to real-time addition of third party products services while maintaining persistent links to third-party inventory management computer systems and methods of use thereof. (DE 312:12-14).

Thereafter, Ms. Vandivier gave a detailed description of the development of the "App" (and thus the value to investors) and described the present status of the civil suit in Palm Beach Circuit Court referenced above, where the investors filed a complaint to protect the intellectual property of the Stocket App and to preserve their investment and where the receiver appointed by the Court sought and later received approval to sell substantially all the assets of Stocket to TCI Acquisition Company LLC. See DE 312:14-17 incorporated by reference herein and for this detailed description including docket entries from the case specifying the value of Stocket shares.

### At Sentencing the Court Accepted Ms. Vandivier's Net-Loss Approach, Applied an Actual Loss Computation and Reduced the Loss Accordingly

At Ms. Vandivier's sentencing hearing the defense called Jorge Baez and Harry McMillan as witnesses to establish the updated status of the IPO and the current value of the shares of stock to the stockholders/victims in this case. This allowed the Court to determine the gain to investors for the net-loss computation. This decision by the Court was consistent with Eleventh Circuit case law stating that, when considering the loss caused by fraudulent conduct, "the nature of the individual

12

scheme must determine the correct way to measure the loss." *United States v. Sanders,* 756 Fed.Appx. 917, 918 (11th Cir. 2018)(unpub.); *United States v. Woodward,* 459 F. 3d 1078, 1087 (11th Cir. 2006).

### When the Guideline Loss is based on Actual Loss Eleventh Circuit Law Specifies that the Restitution be the Same as the Actual Loss

Importantly, where the loss figure under the guidelines is determined according to actual loss, the restitution figure will be the actual loss figure. *United States v. Cavallo,* 790 F.3d 1202, 1239 (11th Cir. 2015)("Indeed, in a typical case where a defendant's loss amount under the guidelines is determined by a calculation of actual loss, the restitution figure should usually be the same as the loss amount," citing *United States v. Huff,* 609 F.3d 1240, 1247 (11th Cir. 2010)). This is as opposed to intended loss where the restitution amount will presumably be less than the actual loss guideline figure. *Cavallo* 790 F.3d at n. 27. Here, the Court made an actual loss finding relying on the testimony presented by Ms. Vandivier at the sentencing.

At the sentencing hearing, Harry McMillan testified that he is the President of TCI Entertainment and that he approached Jim Sallah, the Receiver appointed by the Circuit Court in West Palm Beach, to potentially purchase the shares of Social Voucher/Stocket. (See transcript of Sentencing hearing attached hereto as Defense Exhibit A at 3). Thereafter, he offered to buy the shares Stocket by offering $175,000.00 in cash and by issuing 10,880,000 shares of TCI Entertainment common stock to Stocket shareholders. (Defense Exhibit A at 4). McMillan testified that he

retained Vantage Points Advisors who performed a valuation of Stocket and concluded that the value was $10,308,5000. (Defense Exhibit A at 10). Further, he testified that he procured an Initial Public Offering (IPO) of $40,000,000.00 from Dawson James Securities. (Defense Exhibit A at 13). He related that there were 21,500,000 shares of TCI stock outstanding of which 10,800,000 shares of TCI belonged to the receiver on behalf of Stocket Shareholders. (Defense Exhibit A at 16). He testified that the price per share value of the IPO would result in a per share of between $4.75 to $5.25 per each Stocket share. (Defense Exhibit A at 16).

Following McMillan, the defense called Jorge Baez as a witness. Mr. Baez testified that he is the Director of NERA consulting which is a firm of economists that do economic and statistical analyses dealing with securities and financial issues. (Defense Exhibit A at 27-28). After relating his educational and professional background, Mr. Baez was offered, and accepted by the Court, as an expert in the field of statistics, finance and economics. (Defense Exhibit A at 32). Mr. Baez opined that based on his review of all the relevant financial data, including the testimony of Harry McMillan, the losses suffered by the Vandivier investors was between $420,000 and $650,000. (Defense Exhibit A at 34). He based these figures on the following: Vandivier investors spent $2,100,000.00. That purchase netted the investors 1,900,000 shares of Stocket. The conversion rate for Stocket shares to TCI shares was 6.3 shares of Stocket to one share of TCI. Applying this conversion ratio resulted in the finding of the Vandivier investor portion of the 10,800,000 of TCI stock (allocated

to the receiver) to be 300,000 shares of TCI stock. By then applying the price per share (as testified to by Harry McMillan) of between $4.75 to $5.50 resulted in the stock value to Vandivier investors of between $1,500,000 to $1,700,000. As a result, the loss to Vandivier investors was between $420,000 to $650,000. (Defense Exhibit A at 34-37). At the conclusion of the testimony and after argument by counsel, the Court accepted the Vandivier's loss computation stating, "looking at the loss here, having now again, looked at the testimony of the witnesses, since there's no rebuttal evidence but nonetheless, the Court will find that the loss does exceed five 150,00 but it is less than 1.5 million, so it does fall in that range. I can't give an exact number but I will say that it's not greater than 1.5 million so we'll change the level to, what, 22 now." (Defense Exhibit A at 51). After further consultation with the probation officer and the parties, the Court adjusted the offense level accordingly. (Defense Exhibit A at 52).

## The Court's Actual Loss Finding is the Restitution Amount

In conclusion and as stated previously, the Eleventh Circuit has ruled that where the loss figure under the guidelines is determined according to actual loss, the restitution figure will be the actual loss figure. *United States v. Cavallo,* 790 F.3d 1202, 1239 (11th Cir. 2015)("Indeed, in a typical case where a defendant's loss amount under the guidelines is determined by a calculation of actual loss, the restitution figure should usually be the same as the loss amount," citing *United States v. Huff,*

15

609 F.3d 1240, 1247 (11th Cir. 2010)). This is as opposed to intended loss where the restitution amount will presumably be less than the actual loss guideline figure. *Cavallo* 790 F.3d at n. 27. Here, the Court made an actual loss finding relying on the testimony presented by Ms. Vandivier at the sentencing. That actual loss was $420,000 to 650,000. As a result, this is the amount of restitution to be imposed and Ms. Vandivier requests that the Court order restitution according to the actual loss finding made at the sentencing hearing on January 26, 2023.

WHEREFORE, Cindy Vandivier hereby files this Memorandum Regarding Restitution

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: *s/Timothy M. Day*
    Timothy M. Day
    Assistant Federal Public Defender
    Florida Bar No. 360325
    One East Broward Boulevard,
    Suite 1100
    Fort Lauderdale, Florida   33301
    (954) 356-7436
    Timothy_Day@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on July 7, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/Timothy M. Day*
Timothy M. Day